**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Norfolk Division


L.H., as mother and next friend,
         JUANITA MATTHEWS,

                        Plaintiff,

v.                                                          ACTION NO. 2:15cv382


CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                        Defendant.



## UNITED STATES MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Juanita Matthews brought this action on behalf of her minor son, L.H. ("plaintiff"),
pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), seeking judicial review of a decision of the Acting
Commissioner ("Commissioner") of the Social Security Administration ("SSA") denying
plaintiff's application for supplemental security income ("SSI") under Title XVI of the Social
Security Act.

An order of reference dated November 16, 2015, assigned this matter to the undersigned.
ECF No. 10.  Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C), Rule 72(b) of the
Federal Rules of Civil Procedure, and Local Civil Rule 72, it is hereby recommended that
plaintiff's motion for summary judgment (ECF Nos. 15-16) be DENIED, and that the
Commissioner's motion for summary judgment (ECF No. 19) be GRANTED.

## I. <u>PROCEDURAL BACKGROUND</u>

Juanita Matthews filed an application for SSI on January 9, 2012 on her son's behalf, R. 135-40[1], alleging he became disabled on March 29, 2010 due to asthma, chronic bronchitis, allergies, attention deficit hyperactivity disorder ("ADHD"), oppositional defiant disorder ("ODD"), and enuresis.  R. 97, 101.  The Commissioner denied plaintiff's claim on March 5, 2012 and, upon reconsideration, on May 31, 2012.  R. 98-100, 105-08.  At plaintiff's request, an Administrative Law Judge ("ALJ") heard the matter on January 14, 2014, and at that hearing received evidence and testimony from L.H. and his mother.[2]  R. 35-95, 113-14.  On February 28, 2014, the ALJ denied plaintiff's claim, concluding that L.H. was not disabled as of January 9, 2012, the date of his SSI application.  R. 16-30.

On April 24, 2015, the Appeals Council denied plaintiff's request for review of the ALJ's decision.  R. 6-10.   Therefore, the ALJ's decision stands as the final decision of the Commissioner for purposes of judicial review.  *See* 42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481.  Having exhausted all administrative remedies, plaintiff filed a *pro se* complaint with this Court on September 9, 2015.  ECF No. 3.  The Commissioner answered on November 12, 2015.  ECF No. 9.  In response to the Court's order, the parties filed motions for summary judgment, on February 11 and April 21, 2016, respectively.  ECF Nos. 15-16, 19-20. In response to plaintiff's request for additional time to prepare an adequate summary judgment filing, on February 22, 2016, the Court granted plaintiff an additional thirty days to file a supplemental motion for summary judgment.  ECF No. 18.  Plaintiff, however, neither submitted such a filing nor filed a reply to the Commissioner's motion for summary judgment.  As neither

[1] Page citations are to the administrative record previously filed by the Commissioner.

[2] At the start of the hearing, L.H.'s mother advised that she had not obtained an attorney for the matter.  R. 37.  She further declined an opportunity to delay the hearing to give her time to find an attorney and signed a written waiver of counsel.  R. 39, 134.

party has indicated special circumstances requiring oral argument, the case is deemed submitted

for a decision.

## II.  <u>RELEVANT FACTUAL BACKGROUND</u>

### A.    *L.H.'s Background*

L.H. is a ten year old boy, who was born in 2005 and, at the time of the hearing before

the ALJ, was in the third grade.  R. 44, 85.  L.H. was four years old on March 29, 2010, the

alleged onset date of disability.  R. 97.

### B.    *Relevant Medical Records from November 2, 2009*

<u>Hospital Records</u>

L.H. received treatment at the Clay County Medical Center on three occasions in 2011

and 2012.  First, on January 17, 2011, L.H. received treatment at the emergency room for having

broken off the cotton tip of a Q-tip in his right ear, while cleaning the ear.  R. 271-77.  The

emergency physician's notes regarding past history contains notations for "ADD" and asthma.

R. 272.  Second, on November 27, 2011, L.H. received treatment at the emergency room for a

cough, congestion, fever, sore throat, and stomach pain.  R. 259-60.  A patient history taken on

this date noted the medications Zyrtec, Singulair, and Albuterol.  Following an examination, a

negative strep test, and laboratory results showing normal blood and urine samples, L.H. was

discharged with prescriptions for Zyrtec, Nystatin cream (for jock itch), and Amoxicillin.  R.

261, 264, 267.  Third, on February 16, 2012, L.H. was treated for cellulitis, associated with a

skin wound that had become infected.  R. 357-39.

<u>Community Counseling Services Records</u>

L.H. received services from Community Counseling Services ("CCS") of the Department

of Mental Health from November 2, 2009 through April 8, 2013.  On the November 2, 2009

visit, L.H. was diagnosed as having ADHD and ODD (axis I), asthma and anemia (axis III), family stressors (axis IV), and assigned a global assessment functioning ("GAF")[3] score of 35. The provider noted that L.H., who was then five years old, was reported to display behaviors "such as acting out, throwing temper tantrums, hitting, and not following directions for the last [four] years."  R. 291.  The provider notes further report that L.H. failed to stay in his seat at school, struggled academically and in expressing his feelings, had bladder and bowel control issues, and cried uncontrollably when awakened from sleep.  R. 291.

Thereafter, during the school year from November 2009 through June 2010, L.H. received group and individual therapy on approximately 28 occasions with CCS therapists to work on increasing his attention span, self-control, academic progress, social skills, ability to follow directions, and compliance with medications.  R. 284-90.  During this time period, the therapists' notes indicate that L.H. generally experienced improvement and made progress (although sometimes intermittent) towards meeting these treatment goals.  R. 284-90.

This therapy continued during the next school year over the course of approximately 18 sessions from September 2010 through April 2011.  This therapy sought to improve L.H.'s attention span, social skills, behavior at school, self and impulse control, coping skills, and to monitor his academic performance.  R. 270-83.  On October 26, 2010, L.H.'s mother reported to

---

[3] The GAF scale, devised by the American Psychiatric Association, ranges from zero to one hundred and indicates an overall assessment of a person's psychological, social, and occupational functioning.  *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR), 34 (4th ed. 2000).  The following ranges are linked to the following symptomology:  (1) 91-100 – no symptoms, superior functioning; (2) 81-90 – absent or minimal symptoms, good functioning; (3) 71-80 – transient symptoms, no more than slight impairment in functioning; (4) 61-70 – some mild symptoms, generally functioning pretty well; (5) 51-60 – moderate symptoms and moderate functional difficulties; (6) 41-50 – serious symptoms and serious functional impairments; and (7) 31-40 – "some impairment in reality testing or communication . . . and major impairment in several areas" of functioning.  *Id.*  The DSM-V abandoned the use of GAF scores as a diagnostic tool for characterizing patient functioning due to the questionable probative value of the scores.  *Diagnostic and Statistical Manual of Mental Disorders* (DSM-V) 16 (5th ed. 2013).

the therapist that L.H. had been identified as being 18 months behind developmentally. R. 283. In November 2010, L.H.'s teacher reported that his academic performance was below average and therapist notes indicate that, during this month, L.H. struggled with social skills, repeatedly got out of his seat at school, "express[ed] defiant behavior," and was generally non-compliant with directions to control his behavior. R. 282. In the months that followed, however, L.H.'s behavior and academic performance generally improved significantly, as reported by both the therapist and the teachers with whom she spoke. R. 279 (March 23, 2011: mother and therapist both indicate L.H. making "great progress" towards behavioral and therapeutic goals); 280 (January and March 2011: "received good reports from his teacher" and "has greatly improved academically"); 281 (January 19, 2011: "Teacher reported . . . greatly improved behavior").

On December 21, 2011, L.H. was evaluated by Dr. S. Aleem at CCS. A mental status examination revealed normal findings. R. 278. L.H.'s mother reported, as discussed further below, that he had been prescribed a Daytrana patch for ADHD and L.H. was not doing well and that his grades were "not at all good." R. 278. Dr. Aleem recommended that L.H. continue with the Daytrana and his CCS therapy and that he undergo psychological testing. R. 278. Dr. Aleem's diagnoses at this time were ODD, ADHD NOS, and intermittent explosive disorder. R. 278.

During the 2011-2012 school year, L.H. met with his therapist on February 7 and April 11, 2012. R. 346. During the first meeting, L.H. reported doing well that week ("received all greens") and the therapist noted he was making progress. During the second session, the therapist noted that his teachers had reported that L.H. was not making progress with following class rules and doing his work. R. 346.

On June 20, 2012, L.H. had a follow-up appointment with Dr. Aleem. R. 372. The

assessment reflected in Dr. Aleem's medical progress notes recited both "ODD" and "ADHD NOS." R. 372. Dr. Aleem's mental status exam again reviewed normal findings. R. 372. During the visit, L.H.'s mother reported that L.H.'s medications were "helping somewhat," but that he exhibited "hyperactivity [and] disruptive behavior." R. 372. Dr. Aleem noted that, although L.H. had not received any medication on the day of the appointment, he was able "to sit mostly quietly [and] answer smartly . . . ." R. 372. At Dr. Aleem's suggestion, L.H.'s mother agreed to a "drug holiday" for the summer, but she requested continuing therapy and counseling for her son. R. 372.

L.H.'s therapy then resumed in September 2012 and apparently concluded for the school year, after approximately 18 sessions, in April 2013. R. 360-71. Therapist notes from September 5, 2012, indicate that the therapist counseled L.H. for twisting another classmate's arm, reportedly while playing in the bathroom, and that L.H. admitted that he knew his behavior was wrong and apologized. R. 371. On October 8, 2012, L.H.'s mother expressed concerns about his "extremely hyper" behavior upon returning home from school and a recent series of episodes of vomiting and coming home from school due to an upset stomach. R. 370. The therapist referred the mother to the family doctor and noted L.H. had mild behavioral issues and needed to work on impulse control and coping skills. R. 370. While noting that L.H.'s behavior was "mild" on October 8, 2012, the therapist also reported he needed to work on impulse control and following directions. R. 369. On November 5, 2012, the therapist noted that L.H. displayed a positive attitude, remained on task, and followed directions at school. R. 369.

On November 4, 2012, CCS created an individual service plan for L.H. R. 367-68. The plan identified diagnoses of ADHD and ODD on axis I and asthma on axis III and specified a global assessment function score of "50/55." R. 367. The plan focused on L.H.'s impulsive

behavior and problems in following directions and in expressing himself and his feelings, which issues reportedly dated back three to four years and recurred frequently.  R. 367.  The plan identified a long term goal of completion of high school and short-term objectives of using impulse control techniques, developing and using coping skills in connection with learning how to verbalize and express himself, and improving his ability to follow directions.  R. 368.

Therapist notes from November and December 2012 document the completion of paperwork for L.H. to take medication at school (as he was now taking such medication three times per day) and that he had also been prescribed medication for bladder control and to increase his appetite.  R. 365-66.  The notes from these visits indicate L.H. reportedly was doing "okay" or "good" and that his behavior was mild or stable.  R. 365-66.

In January 2013, the notes indicate that the therapist counseled L.H. to be sure to respond when spoken to by others, rather than just staring and looking back at them.  R. 365.  Other notes from January 2013 report that a family member said that a teacher indicated that L.H. had been doing "little things every day" and had refused to follow the teacher's requests at times.  R. 364. The therapist expressed concern that the defendant's medications either were not being given to L.H. or that an adjustment was needed.  R. 364.

In February 2013, L.H. reported to the therapist that he was "good," had been keeping his hands to himself, and was interacting well with others.  R. 363.  The therapist also noted that she had received "no reports of negative interaction with peers" and identified L.H.'s behavior as "stable."  R. 363.  Also in February, the therapist discussed how to ensure L.H. took his medication. R. 363.

In March and April 2013, therapist notes indicate that L.H. began to exhibit unstable behavior, involving "being a little disrespectful, not following directions, and not being verbal,"

and the therapist reported noticing that L.H. had "to have instructions or directions given to him [three] or more times" before responding.  R. 361-62.  The therapist recommended visiting the family doctor and seeking a medication adjustment.  R. 361.  Similar problems were noted on April 8, 2013, when L.H. appeared to be off his medication and awaited a re-fill of a prescription.  R. 360.

Psychological Evaluation by Glenn Ellis, Ph.D.

In late June 2012, Dr. Glenn Ellis conducted a psychological evaluation of L.H. at the request of CCS.  R. 412-15.  As part of this evaluation, Dr. Ellis assessed L.H. on two occasions, administered certain tests to him, and spoke with his mother, who accompanied L.H. to the appointments.  R. 412.  During the evaluation, Dr. Ellis noted that L.H. was "mildly hyperactive," "stood throughout the assessment process," and had difficulty sitting "without squirming or fidgeting."  R. 414.  Dr. Ellis also noted that he found it difficult to understand L.H.'s speech due to the fact that he either "spoke very softly or possibly exhibited a speech impediment."  R. 414.  Intelligence testing by Dr. Ellis revealed a full-scale IQ score of 85, indicative of a low average range of ability.  R. 413.  Based on L.H.'s performance on a word recognition test, Dr. Ellis judged him to be at a "third grade reading level," at a time when L.H. would be starting second grade in the fall.  R. 413-14.  Dr. Ellis further noted that, while testing showed L.H.'s pure recall to be "exceptionally strong," L.H. "functionally got lost" when engaging in "mental manipulations to use his memory," consistent with ADHD.  R. 413.  Other testing and evaluation tools used by Dr. Ellis indicated that L.H. had difficulty maintaining attention to and in organizing tasks, in following instructions, and in avoiding distractions. R. 414.  Based on his examination, Dr. Ellis diagnosed ADHD and assigned a GAF score of 70. R. 414-15.  Dr. Ellis also recommended that:  (a) L.H. continue his treatment with CCS and

medication to address his hyperactivity and impulse control problems; (b) L.H. be evaluated by a speech therapist; (c) L.H. receive counseling to address apparent emotional dependence upon his mother; (d) his teachers be advised of his weaknesses and capabilities and that his academic performance be monitored to assess the utility of his medication; and (e) a CCS case worker be assigned to assist L.H.'s mother.  R. 415.

West Point Children's Clinic Records

From October 2010 through April 2013, L.H. also made routine visits for care at the West Point Children's Clinic from his primary care provider, Byron Watson, M.D.  R. 293-322, 373-411.  On October 26, 2010, treatment records note a past medical history of an enlarged heart, asthma, nasal surgery, and ADHD/ODD.  R. 293.  At that time, L.H.'s medications included Albuterol Sulfate, Pulmicort, Singulair, Proventil, Procentra, and DDAVP.  R. 293.

On August 11, 2011, L.H. saw Dr. Watson for an ADHD follow-up at which time his mother reported that L.H. had not taken his ADHD medication all summer because it caused stomach aches.  R. 302.  His mother also reported that L.H.'s teacher advised he did not perform well in school that day and L.H. was up until 11:30 p.m. the night before doing homework.  R. 302.  Dr. Watson noted his prior assessment of ADHD remained unchanged, but prescribed a one month trial of Vyvanse.  R. 305.  At a follow-up visit on September 21, 2011, Dr. Watson reported that, although L.H. reported having belly pains and headaches, that the medication was "working well," the ADHD was "improved," and that L.H.'s mother reported that his grades, home and classroom behavior, and self-esteem were all "good."  R. 306, 308-09.  To deal with stomach issues, Dr. Watson suggested that the medication be administered at school with breakfast.  R. 309.

On October 19, 2011, Dr. Watson's notes reflect that, while L.H.'s mother reported his

classroom behavior was good, he was receiving failing grades at school and behaving poorly at home, and was still experiencing stomach distress from Vyvanse.  R. 310, 312.  Dr. Watson discontinued use of Vyvanse and instead prescribed Daytrana, to be administered via a medicine patch.  R. 312-13.

On January 2, 2012, Dr. Watson saw L.H. for an ADHD follow-up appointment and noted that, although L.H.'s school performance was poor and he was being evaluated for special education and an individualized education program ("IEP"), his behavior was "much improved" and the patient was "pleased with the medication and wishes to continue the current therapy."  R. 322.

During a visit on February 16, 2012, Dr. Watson observed contact dermatitis on L.H.'s trunk where the medicine patches were used and prescribed Hydrocortisone to deal with the rash.  R. 374-76.  Notes from this visit reflect that L.H. had no asthma spells in the last 30 days.  R. 373.

On April 16, 2012, Dr. Watson saw L.H. for an upper respiratory infection and an ADHD follow up appointment.  R. 378.  L.H. reported one prior asthma spell in the preceding 30 days and complained of wheezing and fatigue.  R. 378.  L.H.'s mother advised that L.H. was "doing well" on Daytrana and getting "green," or good behavior reports, "most of the time" from school.  R. 229, 378.  Dr. Watson continued to note L.H.'s ADHD as "improved" and prescribed a medication for an upper respiratory infection, as well as Daytrana, and directed that L.H. take Albuterol for wheezing, as needed.  R. 380-81.

On August 24, 2012, L.H. visited Dr. Watson for an ADHD follow-up and the treatment notes report that L.H. lacked focus and attention at school, was not completing his work, and was "hyper" and not sleeping at home.  R. 388.  Dr. Watson directed that L.H. continue with

Daytrana, but also prescribed a new medication, Ituniv, and referred L.H. to a urologist "for persistent enuresis."  R. 388.

On February 13, 2013, L.H. again visited Dr. Watson for an ADHD follow-up and the treatment notes report that L.H.'s ADHD had "deteriorated" and that patches were no longer working and caused skin irritation.  R. 394, 396.  In response, Dr. Watson discontinued L.H.'s use of Daytrana and Ituniv and prescribed Focalin.  During this visit, L.H. reported having one asthma spell in the preceding 30 days.  R. 394.  When, on March 7, 2013, L.H.'s mother reported that L.H. could not tolerate Focalin and was vomiting after every dose, Dr. Watson substituted a prescription for Vyvanse and directed L.H.'s mother to dissolve the dose in water before administering it.  R. 400.  On April 4, 2013, Dr. Watson noted a "[d]ramatic improvement" in L.H.'s ADHD but, due to L.H. reportedly having some problems in the afternoons, increased the dosage from 20 to 30 mg.  R. 404-05.  During this visit, L.H.'s mother reported that his grades, self-esteem, and home behavior were "fair" and his classroom behavior was "good."  R. 402.  At this time, L.H.'s chart indicated prescriptions for Albuterol Sulfate (for asthma inhaler), Pulmicort (for asthma), Proventil (for asthma inhaler), Elidel (for rash), Vyvanse (for ADHD), Singulair (for allergies), and Cyproheptadine (for appetite).  R. 258, 402.

<u>University Physicians' Records</u>

Upon referral from Dr. Watson, L.H. received treatment on November 8, 2012 and February 11, 2013 for enuresis and urinary frequency from Darlenia Andrews, a nurse practitioner with University Physicians.  R. 416-31.  On the first visit, L.H. received instructions about drinks and foods to avoid or limit and was prescribed Hyoscyamine, to be taken three times daily.  R. 430-31.  At the second appointment, treatment notes indicate that L.H. no longer had to visit the bathroom every fifteen minutes and was now voiding at regularly scheduled

times at school, and only rarely had accidents there.  R. 416.  His mother, however, still reported

bedwetting by L.H. several nights a week.  R. 416.  No change in L.H.'s treatment plan was

made at that time and he was directed to return for an appointment in six months.  R. 416-17.

<u>State Agency Opinion Evidence</u>

On February 7, 2012, Tammy McGee, M.D., reviewed the medical evidence of record

concerning L.H.'s asthma and allergic rhinitis and opined that neither impairment was severe.  R.

323-28.

On February 27, 2012, a mental health consultant, Liz Yazdani, Ph.D., reviewed the

medical and other evidence of record concerning L.H.'s ADHD and ODD and opined that, while

these impairments were severe, they (and any combination thereof) did not meet, medically

equal, or functionally equal any listed impairment.  R. 329-34.  Dr. Yazdani further opined that

L.H.'s impairments caused less than a marked limitation in functioning in the domains of

acquiring and using information, attending and completing tasks, and interacting and relating

with others, and found no limitation in L.H.'s ability to care for himself.  R. 331-32.

On March 14, 2012, Cindy Beckham, who possesses a certificate of competence for

speech language pathologists ("CCC-SLP"), reviewed the evidence of record concerning L.H.'s

receptive language delay and articulation disorder and opined that, while these impairments were

severe, they (and any combination thereof) did not meet, medically equal, or functionally equal

any listed impairment.  R. 339-44.  Ms. Beckham further opined that, in the absence of any

recent trauma, it was "reasonable to assume that current scores would not be marked or extreme"

with respect to L.H.'s ability to acquire and use information and to interact and relate with

others.  R. 341.

Finally, on May 25, 2012, Eva Henderson, M.D., conducted a reconsideration disability

evaluation based upon the updated evidence of record. R. 347-52. Dr. Henderson found that L.H. had severe impairments, but also opined that such impairments did not meet, medically equal, or functionally equal any listed impairment. R. 347. Dr. Henderson also opined that L.H. had less than marked limitations in acquiring and using information, attending and completing tasks, and in interacting and relating with others, and no limitations in caring for himself and in seeing to his health and physical well-being. R. 349-50.

C.     *Records from Non-Medical Sources*

       <u>School Records</u>

       According to a May 2012 report, L.H. received language/speech articulation special education services from August 2011 through May 2012 on a monthly basis. R. 185 (referencing speech classes twice per week), 200. The record contains only the May 2012 report, which indicates that L.H. was making progress toward his instructional goals and it was anticipated he would meet them, but needed more time to accomplish this. R. 200. The provision of such services to L.H. apparently resulted from a September 2008 assessment and an October 2011 reevaluation of whether L.H. had a disability giving rise to the need for special education intervention and services. The initial assessment in 2008 reported that, while the assessment identified no problems necessitating early intervention with respect to L.H.'s physical capabilities, his expressive or receptive language abilities, his social skills, and cognitive abilities, L.H. possessed "moderate to severe misarticulations [in speech] characterized by substitutions and omissions." R. 149, 154. The October 2011 reevaluation, which occurred after L.H.'s alleged disability onset date, confirmed this same finding of disability. R. 151.

       The remaining educational records primarily consist of L.H.'s miscellaneous daily behavior report cards and weekly behavior charts. These documents graded: (a) L.H.'s attention

to teacher instructions, class lessons, and assigned work and whether he kept his hands to himself and avoided improper touching of classmates and their property, based on a percentage scale ranging from 0 to 100%; and (b) L.H.'s behavior on a scale ranging from green (good behavior) to yellow (verbal warning) to blue (loss of a privilege) to red (contact parent/principal).  R. 228-29.  Approximately seven of the thirteen behavior report cards included in the record reported some kind of behavior related to either inattentiveness or improper touching.  R. 224-45.  The nine weekly behavioral charts in the record reflect approximately 21 days of good behavior and approximately 9 days on which L.H. exhibited behavioral problems.  R. 229-47.

School records also reflect that, on November 9, 2013, L.H.'s mother met with various school district personnel, including teacher support team members and a special education teacher, to request a comprehensive assessment of L.H. and his placement in special services.  R. 248, 251.  After reviewing the matter, school officials denied the request due to L.H.'s educational record and grades and because they assigned him to a teacher support team and would review his status in February 2014.  R. 248, 250-53, 255.

Function Reports

In January 2012, L.H.'s mother and grandmother (Brenda Barnes) submitted function reports for L.H. that are similar, but not identical.  R. 155-64, 169, 176-83.  Both reported that, although L.H. has problems talking clearly, his speech usually can be understood by others most of the time.  R. 157, 178.  They noted that L.H. is generally able to communicate and can use sentences, express his needs, talk with others, and talk about past events, but reported that he cannot deliver telephone messages and is unable to explain why he did something and pose inquisitive questions.  R. 158, 179.  With respect to his ability to learn and use knowledge, they noted that L.H. knows and can read the alphabet, simple words, simple sentences, and stories,

knows and can recite numbers and add and subtract numbers over ten, can tell time, and print his name, but cannot write in longhand, cannot write a simple story, is unable to make correct change with money, and neither asks what words mean nor knows his own birth date or telephone number.  R. 159, 180.  Both reported that L.H.'s physical abilities are not limited in any way.  R. 160, 181.  While checking the box indicating that she was "unsure" whether L.H.'s impairments affected his behavior with others, his mother noted that he has friends his own age and can make new friends, gets along with adults and teachers, and plays team sports, including T-ball.  R. 161.  His grandmother answered similarly, but observed that L.H. does not enjoy being with other children of the same age and does not like to take turns.  R. 181.  Both women also noted that L.H. is mostly able to engage in tasks related to caring for himself, but has problems tying shoelaces, hanging up clothes, washing his hair, obeying safety rules, and accepting correction.  R. 162, 182.  Both women also noted that L.H. has a limited ability to pay attention and stay on task, but his grandmother noted L.H. is able to play games or watch TV for up to 30 minutes.  R. 163, 182.

### D.    *Hearing Testimony – January 24, 2014*

At the hearing before the ALJ, L.H.'s mother testified at length concerning his problems, history, and treatment.  With respect to L.H.'s ADHD and ODD, she said that the current medication (Vyvanse, 40 mg.) taken by L.H. "is helping."  R. 50, 258 (current medication list). Due to teacher complaints, she advised that L.H. was also taking a second medicine (Risperidone) to help control his outbursts.  R. 50, 258.   Concerned about making L.H. too sleepy and unable to focus and wanting him medicated only during school hours, his mother stated she is hesitant to follow the doctor's suggestion to increase dosages.  R. 50-52, 57. Nevertheless, she reported that L.H. continues to exhibit symptoms associated with ADHD and

ODD, including comprehension issues, outbursts, "fumbling" at his desk, hitting other students, throwing things, acting up as the medication wears off towards the end of the school day or on days he has not taken his medication[4], needing extra time to complete tasks, and exhibiting behavior problems leading to in-school suspensions ("ISS") or notations on his behavior charts. R. 51-52, 63-64, 67.  Although she acknowledged that a teacher support team was currently working with L.H. on his handwriting and behavior, she indicated his handwriting is very poor and not at a third grade level.  R. 58-59.  In spite of this, she testified that L.H. mostly wants to go to school, is meeting his accelerated reading goal, and has made the honor roll with grades of A's and B's, but expressed skepticism about those grades and requested additional testing to verify that no one else was helping him.  R. 59-60, 66.  Finally, she noted that L.H. had been diagnosed with a speech problem and sometimes mumbles or takes 10 minutes to answer a question.  R. 67, 69, 71-72.

With respect to his asthma, his mother noted that L.H. takes three, prescribed medications (Albuterol, Pulmicort, and Proventil) on an as needed basis.  R. 53.  In this regard, she noted that L.H. sometimes wheezes at night, gets winded faster and has less endurance than other kids, and complains of being tired.  R. 54.

With respect to enuresis, his mother agreed that L.H. was "much better now," was not bedwetting, was able to control his bladder at school with medication (Hyoscyamine), and needed to ask to go to the bathroom only one or two extra times.  R. 48-49, 258.

With respect to activities of daily living, she reported that L.H. has had a dog for five years, that he performs some chores, such as feeding the dog, that he can bathe himself, that he sometimes picks out his own clothing to wear, that he watches TV and plays video games, that

---

[4] Similarly, she noted that neither her sister nor her mother want to watch L.H. if he has not taken his medication.  R. 52-53.

he is competitive and a sore loser who acts out inappropriately, that he does not have friends he visits or who visit him[5], and that he fights with his sister, but allows her to help with his school work.  R. 72-73, 76-81.  She further reported that L.H. currently was not playing any sports, but had played T-ball in the two preceding years.  R. 82.

A medication list completed by his mother at the hearing indicated that, in addition to the medications noted above, L.H. also had prescriptions for Singulair, Pataday (eye drops), Cetirizine, and Nasonex nasal spray for his allergies and a prescription for Cyproheptadine for his appetite.  R. 258.

L.H. also testified and recited his age and identified himself as a third grader.  R. 85.  He stated he was doing well in school and described his best subject as math.  R. 85.  He stated that in his free time he liked to play hide and seek with his sister, who was one year older than him, and also reported playing basketball and riding his bike.  R. 86, 89, 92.  He identified his bulldog by name and described the color of the dog's coat.  R. 87.  He stated that, after doing his homework, he likes to watch cartoons on TV, and also plays video games on the Xbox or on a phone.  R. 89-91.  He reported having friends at school, with whom he played at recess.  R. 93.

### III.  <u>THE ALJ's DECISION</u>

To evaluate L.H.'s claim for supplemental security income for a child, the ALJ followed a three step analysis set forth in the SSA's regulations, *see* 20 C.F.R. § 416.924, by evaluating whether:   (1) L.H. is engaged in substantial gainful activity;  (2) L.H. has a medically determinable impairment or combination of impairments that is severe; and (3) such impairment meets, medically equals, or functionally equals an impairment in the Listing of Impairments ("listing"), described in 20 C.F.R. § 404, Subpart P, App. 1.  R. 16-17.  At step one, the ALJ

---

[5] In this regard, Ms. Matthews advised that she needs to monitor such visits because she worries that, in her absence, L.H. will get physical with visitors due to his competitive nature.  R. 79-80.

found that L.H. had not engaged in substantial gainful activity since January 9, 2012, the date of his SSI application.  R. 19.  At step two, the ALJ determined that L.H.'s ADHD and ODD constituted severe impairments, but that his other conditions (asthma, chronic bronchitis, allergies, bedwetting, and speech articulation disorder) were not severe.  R. 19.  At step three, the ALJ found that L.H.'s impairments (and the combination thereof) neither met nor medically equaled the severity of a listing.  R. 19-20.  Further, by examining the six domains of functioning, the ALJ determined that the limitations resulting from L.H.'s impairments did not functionally equal the listed impairments either.  R. 19-30.  Accordingly, the ALJ concluded that L.H. was not disabled from the date of his SSI application through the date of the ALJ's decision on February 28, 2014.  R. 30.

## IV.  STANDARD OF REVIEW

In reviewing a decision denying benefits, the Court is limited to determining whether the record contains substantial evidence supporting the Commissioner's decision and the proper legal standard was applied in evaluating the evidence.  42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance of evidence. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

When reviewing for substantial evidence, the Court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner.  *Craig*, 76 F.3d at 589; *Hays*, 907 F.2d at 1456.  "Where conflicting evidence

allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." *Craig*, 76 F.3d at 589 (quoting *Walker v. Bowen,* 834 F.2d 635, 640 (7th Cir. 1987)).  The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Perales*, 402 U.S. at 390; *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)).  Thus, reversing the denial of benefits is appropriate only if either (A) the record is devoid of substantial evidence supporting the ALJ's determination, or (B) the ALJ made an error of law.  *Coffman,* 829 F.2d at 517.

## V. **ANALYSIS**

To be entitled to receive SSI benefits, a child must be disabled due to "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C)(i); 20 C.F.R. § 416.906.  SSA regulations set forth the three-step process described above for evaluating children's disability claims.  20 C.F.R. § 416.924(a).

Against this backdrop, the *pro se* plaintiff challenges the ALJ's decision as "unfair" and requests that the Court "look through his records again" because they support the health conditions described in the SSI application.  ECF No. 16 at 2.  Plaintiff further argues that the "ongoing health" issues experienced by L.H. seriously affect his life, requiring daily medication "to help [his] body function correctly" and "special attention at times along with patience for his growth."  ECF No. 15 at 2.  Mindful of its obligation to liberally construe a *pro se* plaintiff's brief, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972) (per curiam), the Court will assess the

ALJ's decision to determine whether it contains any errors of law and is supported by substantial evidence in the record.

**A.     Step One - L.H. has not engaged in substantial gainful activity.**

It is undisputed that the plaintiff, a school age child, has not engaged in substantial gainful activity, as described in 20 C.F.R. §§ 416.924(b), 416.972(a) and (b).  The ALJ's finding of the same is supported by substantial evidence.

**B.     Step Two - L.H.'s  ADHD and ODD constitute severe impairments, but his asthma, chronic bronchitis, allergies, and enuresis are not severe.**

The second step in assessing SSI eligibility requires consideration of whether the claimant suffers from "a medically determinable impairment(s) that is severe," as opposed to a "slight abnormality or a combination" thereof causing "no more than minimal functional limitations."  20 C.F.R. § 416.924(c).  SSA determines whether an impairment is "severe" by considering "all relevant information" of record, including information from medical and nonmedical sources, and examining how any alleged impairment limits and restricts a claimant's mental and physical health and functioning on a daily basis, in light of the claimant's age.  20 C.F.R. §§ 416.924a, 416.924b(a)(1).

The ALJ's finding that plaintiff's ADHD/ODD constitutes a severe impairment is undisputed and supported by substantial evidence.  Although plaintiff does not explicitly contest the ALJ's corresponding finding that L.H.'s asthma, chronic bronchitis, allergies, and enuresis are not severe impairments, that determination is also supported by substantial evidence. Although L.H. was diagnosed with asthma and has a history of bronchitis and allergies, R. 258, 293, 378, 402, the record reflects, as noted by the ALJ, that he is able to play basketball, ride a bike, play outside, and has played T-ball in the past.  R. 23-24.  Further, L.H.'s medical records indicate that, with proper medication, he had only two reported asthma spells in the 15 months

from February 2012 through April 2013.  R. 19.  Also, the ALJ ascribed great weight to the conclusion of the medical consultant who reviewed L.H.'s medical records and opined that his reported asthma and allergic rhinitis were not severe conditions.  R. 24, 323-38.  Such evidence well supports the finding that these conditions are not severe, remain well-managed, and impose no serious functional limitations upon L.H.  R. 19, 23, 323-38.

Similarly, while noting that L.H. received treatment for enuresis and his mother's concerns about this issue, the ALJ documented that L.H.'s mother agreed during the hearing that, once properly treated with medication, this problem was "much better now," as evidenced by the fact that L.H. was no longer bed wetting, voided at regularly scheduled breaks during school, and only infrequently needed extra restroom breaks.  R. 48-49.  This evidence is more than adequate to support the conclusion that this condition is also not severe.

C.     **Step Two - The ALJ erred in determining that L.H.'s speech articulation disorder was not severe.**

The ALJ also determined that L.H.'s speech articulation disorder was not severe.  R. 19. As grounds therefor, the ALJ noted that, although L.H. received speech therapy special education, "the teacher indicates no significant speech problems" and "treating source records reveal no problems with [L.H.'s] speech."  R. 19.  Finding that such evidence failed to establish that this condition "imposed at least moderate mental functional limitations for at least 12 consecutive months since the application date," the ALJ concluded that the condition was not severe.  R. 19.

This finding rests upon both errors of fact and law.  With respect to the latter, SSA regulations require the ALJ, at step two, to determine only whether the claimant suffered from a medically determinable impairment or combination thereof that was severe.   20 C.F.R. § 416.924(a), (c).   Rather than doing so, the ALJ erroneously imported the durational

requirement to be considered at the end of step three, into his analysis at step two, and concluded that L.H.'s speech disorder was not severe due to the absence of evidence that the condition "imposed at least moderate mental functional limitations for at least 12 consecutive months since the application date . . . ."  R. 19.  SSA regulations specify, however, that the duration requirement for a child disability is to be considered as part of the analysis at step three.  The regulations state, at step three, that if a claimant's impairment meets or equals (medically or functionally) the requirements of a listing, and also "meets the duration requirement," then SSA "will find you disabled."[6]  20 C.F.R. § 416.924(d)(1); see also 42 U.S.C. § 1382c(a)(3)(C)(i) (to be disabling an "impairment, which results in marked and severe functional limitations, [must] be expected to result in death or [to have] lasted or . . . be expected to last for a continuous period of not less than 12 months").  By using the durational requirement to classify L.H.'s speech condition as not severe at step two, the ALJ committed an error of law.

Also, the ALJ's finding of non-severity is not supported by substantial evidence.  The ALJ's assertion that "the teacher indicates no significant speech problems" is at odds with the evidence of record.  R. 19.  The record, in fact, reveals that a teacher questionnaire sent out by the SSA in late March 2013 to the West Point School District was returned uncompleted, with a notation that L.H. was no longer a student there.  R. 211-22.  To the extent that teachers provided information about L.H.'s speech condition, such information is noted on various forms associated with assessments concluding that L.H. had a speech disability and was in need of special education services (speech therapy).  R. 149 (September 25, 2008 report indicating that L.H. experienced "moderate to severe misarticulations [in speech] characterized by substitutions and omissions").  On or about October 24, 2008, L.H.'s teacher, as well as a speech language

---

[6] Before actually analyzing L.H.'s claim, the ALJ discussed the proper procedure in describing what the regulations required with respect to each of the three steps and placed the analysis of duration in step three.  R. 17.

pathologist, each checked "agree" with the post-comprehensive assessment determination that L.H. was eligible for special education services due to a disability identified as "language/speech**articulation." R. 154. Roughly three years later, and after the alleged onset date, on October 21, 2011, another teacher, as well as a speech pathologist, each agreed during a re-evaluation that L.H.'s "educational performance . . . supports the need for special education and related services" due to his language/speech articulation disability. R. 151. For this reason, and as noted by L.H.'s mother in her response to a disability questionnaire, L.H. received speech therapy on a regular basis during the school year beginning in August 2011 and concluding in or about May 2012. R. 185, 200. A May 2012 report card for this therapy indicates that L.H. was making progress towards and was expected to attain his instructional objectives of improving speech intelligibility and proper pronunciation, but needed additional time to do so. R. 200.

Similarly, the ALJ's statement that "[t]reating source records reveal no problems with claimant's speech" is also at odds with the evidence of record. R. 19. In this regard, Community Counseling Services referred L.H. to Dr. Glenn Ellis for a psychological evaluation in June 2012. R. 412-15. Following the evaluation, Dr. Ellis reported that "[i]t was often difficult to comprehend [L.H.'s] speech because he either spoke very softly or possibly exhibited a speech impediment" and recommended an evaluation by a speech therapist. R. 414-15.

Finally, the ALJ failed to note that the state agency speech pathologist, Cindy Beckham, CCC-SLP, concluded on March 14, 2012, upon reviewing the evidence of record, that L.H.'s receptive language delay and articulation disorder constituted a severe impairment or combination of impairments. R. 339-40.

To be deemed other than severe, L.H.'s speech condition must be a "slight abnormality . . . that causes no more than minimal functional limitations . . . ." 20 C.F.R. § 416.924(c); *see Neal*

*ex. rel. Walker v. Barnhart*, 405 F.3d 685, 688 (8th Cir. 2005) (noting that, at step two, "if the impairments result in no more than minimal functional limitations, the impairments are not severe"). On the basis of the information noted above, the Court concludes that the ALJ's determination that L.H.'s speech condition was not a severe impairment is not supported by substantial evidence.

This error, however, is harmless for the reasons discussed below because the ALJ found another severe impairment (ADHD/ODD), moved onto the next step in the disability analysis, and considered L.H.'s speech condition as part of his analysis in step three. *See, e.g., Hearn v. Comm'r of Social Sec.*, 619 F. App'x 892, 895 (11th Cir. 2015) (holding any alleged error at step two in finding some, but not all, impairments severe was harmless where the ALJ later considered all impairments in combination when assessing disability); *Salles v. Comm'r of Social Sec.,* 229 F. App'x 140, 145 (3d Cir. 2007) (rejecting an ALJ's finding that several impairments were not severe at step two, but holding such error harmless due to the ALJ's finding that claimant had other severe impairments); *Swartz v. Barnhart*, 188 F. App'x 361, 368 (6th Cir. 2006) (same).

**D.      *Step Three – L.H.'s impairments do not meet
         or medically or functionally equal a listing.***

Disability may be established by showing that a claimant's impairments or the combination thereof meet or medically or functionally equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, Part B.[7]  As noted in 20 C.F.R. § 416.925(a), Part B describes "impairments that cause marked and severe functional limitations," which are disabling for

---

[7] In deciding whether a claimant has an impairment or combination thereof that meets or medically equals the severity of listing, or that functionally equals a listing, the regulations require consideration of the combined effect of all medically determinable impairments, even those that are not severe.  20 C.F.R. §§ 416.911(b), 416.923, 416.924(a), 416.924a(b)(4), 416.926a(a) and (c).

children.   To meet a particular listing, a claimant's impairment or combination thereof must satisfy "all of the criteria" of that listing.   20 C.F.R. § 416.925(d); *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (noting that "[a]n impairment that manifests only some of those criteria, no matter how severely, does not qualify").   To medically equal a listed impairment, a claimant must present medical findings "at least equal in severity and duration to the criteria" for the most similar, listed impairment.   20 C.F.R. § 416.926(a).

If a child disability claimant does not have an impairment or a combination of impairments that meets or medically equals any listing, SSA next analyzes whether the claimant's impairment "results in limitations that functionally equal the listings," such that the impairment is deemed to be of "listing-level severity."   20 C.F.R. § 416.926a(a).   Functional equivalence is examined by review of all relevant information in the claimant's case record to assess how the impairment affects a child's functioning (that is, "what a child can and cannot do") in six areas, identified as "domains."   20 C.F.R. § 416.926a(b).   The six domains of functioning are:   (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for one's self; and (6) health and physical well-being.   20 C.F.R. § 416.926a(b)(1).   When a claimant's impairment or combination of impairments results in "marked"[8] limitations in two of these domains, or an "extreme"[9] limitation in one domain, then the impairment or combination is deemed to functionally equal a listing.   20 C.F.R. § 416.926a(a), (e)-(l).   If a claimant establishes

---

[8] A "marked limitation" arises when an impairment "interferes seriously with [a claimant's] ability to independently initiate, sustain, or complete activities" and such limitation is "'more than moderate,' but 'less than extreme.'"   20 C.F.R. § 416.926a(e)(2).

[9] An "extreme limitation" arises when an impairment "interferes very seriously with [a claimant's] ability to independently initiate, sustain, or complete activities" and such limitation is "'more than marked.'"   20 C.F.R. § 416.926a(e)(3).

such functional equivalence and further satisfies the duration requirement, then disability benefits are awarded.  20 C.F.R. § 416.924(d)(1).

>    1.    *L.H.'s impairments neither meet nor medically equal a listing.*

At step three, the ALJ first found that L.H. had neither an impairment nor combination of impairments that met or medically equaled the severity of a listed impairment.  R. 19.  With respect to L.H.'s ADHD/ODD, the ALJ considered the criteria specified in listing 112.11, which specifically addresses "Attention Deficit Hyperactivity Disorder."  20 C.F.R. Part 404, Subpart P, App. 1, § 112.11.  This listing contains the following criteria:  (1) "[m]edically documented findings of" marked inattention, marked impulsivity, and marked hyperactivity (the part A criteria); and (2) at least two of the following:  (a) marked impairment in age-appropriate (i) cognitive/communication function, (ii) social functioning, and (iii) personal functioning, and (b) marked difficulties in maintaining concentration, persistence, or pace (the part B criteria incorporated from § 112.02(B)(2)).  *Id.*

Noting the absence of medical evidence of marked hyperactivity, marked impulsiveness, or marked inattention, and the medical evidence showing that L.H.'s condition was controlled with medication, the ALJ found that the listing criteria were not satisfied.  R. 19-20.  This finding is well-supported by, among other things, evidence showing that:  (1) L.H. was only "mildly hyperactive" when examined by Dr. Ellis, R. 412-15, and was able to "sit mostly quietly [and] answer smartly" when examined by Dr. Aleem, R 372; (2) L.H. generally experienced improvement, exhibited mild or stable behavior, and made progress with regular therapy designed to increase his attention span, self-control, academic progress, social skills, and ability to follow directions, particularly when compliant with his medication regimen, R. 270-90, 346, 360-71; (3) L.H.'s condition and home and school behaviors responded positively, with some

variation, to medication therapy, according to treating physician's notes, R. 302-22, 373-404; (4) notwithstanding some continuing incidents of hyperactivity, inattention, and behavioral problems at school, L.H. remained in regular classes, achieved passing grades, and read above his grade level, R. 60, 248, 250-53, 413-14; and (5) two state agency medical consultants opined that L.H.'s ADHD/ODD failed to meet a listing, R. 329, 347.  This same evidence, and the absence of the requisite impairment severity, also supports the ALJ's conclusion that this impairment failed to medically equal a listing.

The ALJ also found that the combination of L.H.'s impairments, severe or otherwise, also failed to meet or medically equal a listed impairment.  R. 17, 19-20.  Notwithstanding that plaintiff bears the burden of proving this at step three, *Hall ex rel. Lee v. Apfel*, 122 F. Supp. 2d 959, 964 (N.D. Ill. 2000), plaintiff offers neither argument nor sufficient evidence, aside from a questionnaire and function reports submitted by L.H.'s mother and grandmother and the mother's testimony, showing that L.H.'s conditions imposed marked and severe functional limitations upon him.[10]  *See* 20 C.F.R. § 416.924(d)(1) (an impairment meeting or equaling a listing is presumed to cause "marked and severe functional limitations").  The function reports and questionnaire, however, are mostly consistent with the evidence supporting the ALJ's finding.  Giving due consideration to all of the record evidence, including L.H.'s grades and reading level, records showing his progress towards and expected future achievement of speech therapy goals, and the opinions of the state agency medical consultants who considered L.H.'s speech and other conditions and reached the same conclusion as the ALJ, R. 323-32, 339-44, 347-52, the Court finds that substantial evidence supports the ALJ's finding that L.H.'s

---

[10]  The additional, post-hearing evidence attached to plaintiff's brief, ECF No. 16-1, is discussed below.

impairments, taken singly or in combination, fail to meet or medically equal the severity of a listed impairment.

### 2.     *L.H.'s impairments do not functionally equal a listing.*

Before addressing whether L.H. had a marked or extreme limitation in any of the six domains of functioning, the ALJ extensively reviewed the medical evidence, the non-medical evidence, L.H.'s school/therapy records, the opinions of state agency consultants, the hearing testimony, L.H.'s daily activities of living, and the effect of all of his combined conditions, including his speech problems, on his functioning.  R. 20-25.  The ALJ concluded that this evidence failed to establish "disabling functional limitations."[11]  R. 21.  This conclusion is well-supported by the record.  The ALJ then analyzed how L.H. functioned in terms of the six domains noted above.

### a.     *Acquiring and Using Information*

In the first domain, the SSA is required to "consider how well [a claimant] acquire[s] or learn[s] information, and how well [a claimant] use[s] the information" he has learned.  20 C.F.R. § 416.926a(g).  A school-age child, between 6 and 12 years old, "should be able to learn to read, write, and do math, and discuss history and science."  *Id.* at § 416.926a(g)(2)(iv).  Further, he should be able to use such skills in an academic setting to show what he has learned, such as by reading and producing oral and written projects, by working in a group, by participating in class discussions, and by working through math problems.  *Id.*  Outside of school, such a child should be able to utilize his learning to read signs, tell time, make change,

---

[11]  In so concluding, the ALJ ascribed great weight to the opinions of Dr. Ellis and great or significant weight to the opinions of the state agency medical consultants.  R. 24-25.  Although he carefully reviewed the third-party function reports submitted by L.H.'s mother and grandmother, the ALJ gave only "some consideration" to the grandmother's report because she spent less time with L.H. and gave "lesser weight" to the "allegations" of L.H.'s mother because they were "inconsistent with claimant's activities of daily living and observed behavior during medical visits."  R. 25.

and exchange information and ideas with others, by asking questions and expressing himself. *Id.* Against this backdrop, although finding that L.H.'s ADHD/ODD "likely cause[d] some limitation in this domain," the ALJ found that he has less than a marked limitation in acquiring and using information. R. 26.

This conclusion finds substantial support in the record. Although L.H.'s conditions undoubtedly affect his ability to acquire and to use information, the evidence also shows that, with therapy and medication and the support of his mother and family, he generally has continued to make progress, albeit not always evenly, both at home and school. At home, as noted by the ALJ, L.H. is able to attend to his own needs, assist in household chores, and play video games and basketball. R. 26. At school, L.H. receives passing grades, exhibits behavior generally sufficient to allow him to remain in regular classes, is progressing with speech therapy, and, in November 2013, school officials rejected his mother's request to comprehensively assess L.H. and place him in "special services." R. 248 (referral for "Comprehensive Assessment" deemed unnecessary due to educational record and grades), 250-53. Such evidence supports the ALJ's finding and is consistent with the absence of a marked or extreme limitation in this domain.

### b.    *Attending and Completing Tasks*

In this domain, the SSA considers a claimant's ability to focus and maintain attention and his ability to "begin, carry through, and finish [his] activities, including the pace at which" such activities are performed and how changes to the same are handled. 20 C.F.R. § 416.926a(h). A healthy school-age child "should be able to focus . . . attention" to follow instructions, organize his school work, and complete assignments. *Id.* at § 416.926a(h)(2)(iv). He should also be able to focus on details and avoid careless mistakes avoided by others of his age cohort, change

routines and activities, and "stay on task and in place when appropriate." *Id.* Finally, he should be able to transition between events and activities and sustain his attention sufficiently to read by himself, to complete family chores, and to participate in group sports. *Id.* Once again, while recognizing that L.H.'s conditions impaired his ability to attend to and complete tasks, the ALJ determined that he has less than marked limitations in this domain. R. 27.

That finding is supported by L.H.'s receipt of A's and B's at school and his placement on the honor roll. R. 60-61. Indeed, although recognizing that L.H. needed continued services to address matters such as impulse control and following directions, a November 2012 CCS service plan for him specified a long-term goal for his completion of high school. R. 367-68. The ALJ's finding is also supported by L.H.'s generally positive response to therapy and medication over time. R. 365-66 (noting mild or stable behavior in November and December 2012), 402 (treating physician reported "dramatic improvement" with ADHD and noting that mother told primary care physician in April 2013 that his grades and home behavior were "fair" and his classroom behavior was "good"). On the home front, L.H. reportedly is able to help clean his room, feed his pet dog, play games with his sister, and watch television and play video games, after completing his homework. R. 73-74, 76-77, 81, 86, 89. Although L.H. has functional limitations in this domain requiring ongoing therapeutic and pharmacologic treatment, the evidence more than adequately supports the ALJ's determination that such limitations are less than marked.

### c. *Interacting and Relating with Others*

Consistent with SSA regulations, the ALJ next considered whether L.H. had marked or extreme limitations in conjunction with interacting and relating with others. In this domain, SSA considers a claimant's ability to "initiate and sustain emotional connections with others, develop

and use the language of [his] community, cooperate with others, comply with rules, respond to criticism, and respect and take care of the possession of others." 20 C.F.R. § 416.926a(i).  In this regard, healthy, school-age children generally should be able to form durable friendships with one or more of their peers, to begin to know how to work with others on projects and problem solving, to better understand another's point of view and accept differences, and should be able to talk with, tell stories to, and speak with others of all ages in a manner that all can readily understand.  *Id.* at § 416.926a(i)(2)(iv).

While noting that school records "reveal some disciplinary problems," the ALJ found that L.H. has less than marked limitations in this domain due to evidence indicating that:  (1) he was cooperative during medical office visits;  (2) he played T-ball in the past, has friends, and interacts with members of his household;  and (3) his mother reported an absence of physical limitations and indicated on a function report that his impairments do not affect L.H.'s behavior with other people.  R. 27.  In reviewing all of the evidence, the ALJ also took note of contrary evidence indicating that, on occasion, L.H. hit others and acted out at school, his apparent emotional dependence upon his mother, his speech articulation delay and progress with therapy, his mother and grandmother's reports of speech clarity problems, and his competitiveness and sharing issues when playing with other children.  R. 21-24.  The ALJ also noted, among other things, L.H.'s progress aided by medication and therapy, his mild ADHD symptoms and appropriate behavior when interacting with medical professionals, the "numerous great behavior days" at school from October 2012 through February 2013, his mother's function report indicating that L.H. has friends of his own age, can make new friends, plays team sports, and generally gets along with teachers and adults, and the opinions of state agency medical consultants that L.H. had less than marked limitations in this domain.  R. 21-24, 161.

Although there is some evidence, including his mother's testimony at the hearing before the ALJ, that L.H. has significant difficulties interacting and relating with others, the Court's task is not to re-weigh the evidence or to second guess the ALJ's decision to ascribe "lesser weight" to the mother's "allegations," R. 25. *See Craig,* 76 F.3d at 589; *Hays,* 907 F.2d at 1456. Where, as here, the record contains adequate, relevant evidence supporting the ALJ's finding of a less than marked limitation in this domain, it satisfies the substantial evidence standard.

> ### d.   The Remaining Domains:  Moving About and Manipulating Objects, Caring for Self, and Health and Physical Well-Being

There is little to no dispute about the remaining three domains of moving about and manipulating objects, caring for one's self, and health and physical well-being. 20 C.F.R. § 416.926a(j)-(l). Based on his review of all of the evidence, including the opinions of state agency medical consultants, the ALJ concluded that L.H. suffers from no limitations with respect to these domains. R. 24.

With respect to moving about and manipulating objects, the ALJ found no limitation based upon the fact that L.H. played T-ball for two years, played hide and seek with his sister, played basketball, rode a bike, played video games, and played with friends during recess at school. R. 28. Because there is little to no dispute about L.H.'s ability to engage in such activities, aside from managing any isolated bout of asthma, and due to the absence of contrary medical evidence suggesting physical or other impairments seriously impacting L.H.'s ability to move about and manipulate objects as part of his daily life, the ALJ's finding is supported by substantial evidence.

The same is true with respect to the domain of caring for one's self, in which the ALJ also found that L.H. has no limitations. This finding is supported by substantial evidence showing that L.H. cooperates with therapists and medical personnel, gets himself up for school,

sometimes picks out his own clothes, mostly bathes himself, does some chores, including cleaning his room and feeding the dog, is calmed by playing video games, knows to be careful of cars when riding a bike, and better manages, with medication, his need to go to the bathroom.  R. 48-49, 66, 78-79, 81, 92.  Although there is evidence that L.H. still has issues regulating his behavior and may be too emotionally dependent upon his mother, substantial evidence supports the ALJ's finding of no limitation in this domain.

Finally, the ALJ also found no limitation in the domain of health and physical well-being. In this domain, SSA considers "the cumulative physical effects of physical or mental impairments and their associated treatments and therapies on [a claimant's] functioning," not otherwise considered when addressing the claimant's ability to move about and manipulate objects.  20 C.F.R. § 416.926a(l).  Although noting that the record reflects that L.H. needs "[ongoing] medical management," the ALJ found that the medical record, including favorable mental status and physical examinations, few emergency room visits, and the absence of persistent medication side effects or a need for in-patient medical treatment, along with the absence of records showing excessive school absenteeism, support a finding of no limitation.  R. 30.  Giving due consideration to all of L.H.'s impairments and the physical effects of such impairments and assorted medications upon him, the Court concludes that this finding is also supported by substantial evidence.

Because plaintiff has not demonstrated marked limitations in two domains or an extreme limitation in one domain, the Court finds no basis to overturn the ALJ's finding that plaintiff's impairments or the combination thereof do not functionally equal a listing.

E.     *The document attached to plaintiff's summary judgment motion*
       *cannot be considered by the Court and no remand is warranted.*

When reviewing an ALJ's decision, district courts "are restricted to the administrative record in performing their limited function of determining whether the [Commissioner's] decision is supported by substantial evidence." *Huckabee v. Richardson*, 468 F.2d 1380, 1381 (4th Cir. 1972); *see also Smith v. Chater*, 99 F.3d 635, 638 n.5 (4th Cir. 1996) ("[I]n determining whether the ALJ's decision is supported by substantial evidence, a district court cannot consider evidence which was not presented to the ALJ."). Accordingly, the Court cannot consider the portion (four of eleven pages) of a clinical assessment of L.H. conducted on February 8, 2016, which was attached to plaintiff's motion for summary judgment. ECF No. 16-1.

Plaintiff has not requested a remand for consideration of this additional evidence, which arose almost two years after the ALJ's decision. Notwithstanding this, pursuant to statute a "court may . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . ." 42 U.S.C. § 405(g) (sentence six). To be considered as "new," the evidence in question must be neither "duplicative [n]or cumulative . . . ." *Wilkins v. Sec'y of Dept. of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991) (citations omitted). To be deemed "material," there must be "a reasonable probability that the new evidence would have changed the outcome." *Id.* at 97 (citation omitted). Moreover, in order to submit new evidence to the Appeals Council after an ALJ issues a decision, such evidence also must "relate to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. § 404.970(b).

Although describing an assessment performed well after the ALJ's decision, the additional evidence arguably relates back to the period before the decision as it recites a history

34

of L.H.'s condition and behavior, as recounted by his mother.  Because the assessment occurred

after both the ALJ and the Appeals Council considered this matter, good cause exists for any

failure to incorporate the assessment into the record before now.  The information contained in

the assessment, however, is neither new nor material.  Notwithstanding that it is incomplete, the

Court has reviewed the partial report and finds it to be duplicative and cumulative of the

evidence already of record (and/or documents new incidents of behaviors already adequately

described by the record).   For this reason, there exists no reasonable probability that

consideration of the assessment would alter the outcome of plaintiff's claim.   Accordingly,

plaintiff has failed to meet the statutory conditions required to support a remand of this matter to

the Commissioner.

## VI.  RECOMMENDATION

For the foregoing reasons, this Court recommends that plaintiff's motion for summary

judgment (ECF Nos. 15-16) be DENIED, defendant's motion for summary judgment (ECF No.

19) be GRANTED, and the decision of the Commissioner be AFFIRMED.

## VII.  REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28

U.S.C. §  636(b)(1)(C):

1.  Any party may serve upon the other party and file with the Clerk written objections to

the foregoing findings and recommendations within fourteen (14) days from the date of mailing

of this report to the objecting party, see 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of

the Federal Rules of Civil Procedure, plus three (3) days permitted by Rule 6(d) of said rules.  A

party may respond to another party's objection within fourteen (14) days after being served with

a copy thereof.

2.  A district judge shall make a *de novo* determination of those portions of this Report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this court based on such findings and recommendations.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

/s/
_____
Robert J. Krask
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
June 21, 2016